**UNITED STATES of America, Plaintiff,**

v.

**Wilson MONTALVO, Ralph Rosario Diaz, et al., Defendants.**

**No. CRIM. 95-235(DRD).**

United States District Court, D. Puerto Rico.

Aug. 6, 1998.

---

Jeanette Mercado–Rios, U.S. Attorney's Office District of P.R., Hato Rey, PR, for Plaintiff.

Juan R. Acevedo–Cruz, Hato Rey, PR, Jose R. Aguayo, Hato Rey, Christian G. Cox, Tallahassee, FL, Armando Garcia, Tallahassee, FL, Ramon Garcia–Garcia, Santurce, PR, Lydia Lizarribar–Buxo, Hato Rey, PR, William D. Matthewman, Miami, FL, Miguel A. Nogueras–Castro, Federal Public Defender's Office, San Juan, PR, Robert A. Norgard, Bartow, FL, Luis A. Plaza–Mariota, Hato Rey, PR, Steven Potolsky, Miami, FL, Edward S. Staffman, Tallahassee, FL, Donald R. West, Orlando, FL, for Defendants.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Codefendants, Wilson Montalvo, hereinafter referred to as "Montalvo", and Ralph Rosario Díaz, hereinafter referred to as "Rosario", have requested a new trial (Docket No. 621), based on newly discovered evidence and/or *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), violations. The other codefendants joined, (Docket No. 620). The United States opposed the motion,

(Docket No. 624). A hearing was held on the motions on March 25, 1998, (Docket No. 634, Minutes), (Docket No. 637, Transcript). At the end of the hearing the court granted all parties a further opportunity to file additional memoranda. Codefendants Montalvo and Rosario declined but reserved the right to reply, (Docket No. 644). The United States filed its final memorandum on May 6, 1998, (Docket 647). A television interview of the father of the murder victim, the day after the verdict, the source of the request for new trial, was officially translated on July 13, 1998, (Docket No. 654). The court is now ready to rule having the benefit of the memoranda filed by the parties, having held a hearing, (Docket No. 637), and having heard the television tape and reviewed the transcript of the television interview of the victim's father, (Docket No. 654).

Codefendants Rosario and Montalvo allege that statements made by the father of the victim on the day after the verdict attributed to Police/FBI investigator Juan Torres [1] constitute new evidence warranting a new trial as newly discovered evidence pursuant to Fed.R.Civ.P. No. 33. Further, codefendants allege that said statements evidence a violation of the *Brady* standard. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## I. BACKGROUND

In order to evaluate the request, the court first provides a brief background of the case.

Defendants Gregorio Aponte Lazú, hereinafter called "Aponte Lazú", Ada Meléndez García, hereinafter referred to as "Meléndez", Juan Baez Jurado, a.k.a. "Papo", hereinafter referred to as "Baez Jurado", and Wilfredo López Morales, a.k.a. "Freddy,"

hereinafter referred to as "López Morales", were all charged on July 19, 1995, with carjacking and conspiracy in violation of 18 U.S.C. § 2119(2)(3), resulting in the death of a young married female, Edna L. Rivera-Hernández, hereinafter called "Edna". On May 6, 1996, a superseding indictment was filed adding codefendants Wilson Montalvo Ortíz, a.k.a. "Willie Barber", hereinafter referred to as "Montalvo", and Ralph Rosario Díaz, a.k.a. "Juni", hereinafter referred to as "Rosario". The original defendants were charged as the codefendants who actually performed the carjacking; the last two defendants were later charged as the intellectual masterminds behind the carjacking. Rosario was allegedly a drug trafficking "kingpin", and Montalvo was allegedly his principal helper and/or friend. Codefendant Aponte Lazú cooperated and pled guilty prior to the trial; the remaining five defendants were all found guilty on December 12, 1997, after twenty-five days of trial.

## II. FACTS

### A. The crimes

The principal witness was codefendant Aponte Lazú, who began cooperating with the federal authorities on or around April 16, 1996, after having provided the authorities with exculpatory versions as to one codefendant, López Morales [2], and up to then, not implicating in several prior versions the alleged masterminds of the crime, Rosario and Montalvo. Aponte Lazú accepted having committed several nefarious crimes: aggravated arson, drug trafficking, contempt of court, illegal appropriation (stolen cars), falsifying and stealing checks, and finally two murders [3], all in addition to the instant offense.

---

**1.** Juan Torres is a local Commonwealth of Puerto Rico policeman assigned to the FBI. He is one of the investigators assigned to the case. The principal investigators were FBI Agents Andersen, who was the case agent from June to November 1995, and Daryll Huff, who was the case agent from November 1995 to the trial, (Docket No. 573, p. 34).

**2.** Aponte Lazú claims that he originally provided untrue exculpatory information about López Morales because he wanted to "free" López Morales enabling López Morales to kill witnesses.

**3.** The murders were allegedly committed on or around May 29, 1995, a few days before the conspiracy began in the instant case. (The facts connecting Rosario to the two murders were testified out of the presence of the jury. Rosario allegedly requested Aponte Lazú to make a hit in order to enable a friend of Rosario, called Gamalier, to control a drug point.)

Codefendant Aponte Lazú was in custody at a state halfway house in Humacao, together with codefendants Montalvo and Rosario, on or around the first week of June 1995.

Codefendants had known Montalvo since 1985–1986 and also had been in custody with Montalvo and Rosario Díaz at other half houses. On or about June 11, 1995, codefendant Rosario requested that Aponte Lazú help him recover $200,000.00 owed to Rosario by Rosario's brother-in-law "Fonsi", another drug dealer who had been recently killed. According to Rosario the money was in the possession of "Edna", who was a student at American City College ("ACC") in Humacao. Both Rosario and Montalvo were working at ACC as a counselor and as a hair cuttings instructor, respectively, while on leave from the halfway house. Later Montalvo and Rosario discretely showed Edna Aponte Lazú at the college. She seemed to Aponte Lazú to be a decent, nice young girl with "beautiful long hair." Montalvo told Aponte Lazú at the halfway house that Edna was the lover ("chilla") of "Fonsi."[4] A few months prior to the carjacking, Rosario had purchased from the owner of ACC a 49% interest in American City College for $50,000.00 in cash.[5] Rosario requested and was granted that his sister be hired as comptroller with a salary of $1,500.00 a month and he be hired as a counselor at $500.00 a week. Montalvo and Rosario, as teacher and counselor, respectively, had offices in the administration side of the building and had access to student records.

Originally, Rosario requested that Aponte Lazú make the "hit" on Edna at her house so as to make the matter seem as if it were a robbery, Rosario told Aponte Lazú not to lose much time with her if she did not produce the money. Montalvo requested Aponte Lazú not rape her. Rosario provided Aponte Lazú with a description of the vehicle and its license plate. Twenty thousand dollars were originally offered by Rosario for executing the crime; this amount was increased to twenty-five thousand dollars at

the request of Aponte Lazú. Rosario informed Aponte Lazú that another person called "Papo", codefendant Baez Jurado, was coming from Gautier Benitez Public Housing. Aponte Lazú saw Papo in town plaza of the city of Caguas the next day. Papo was to bring a weapon for the hit. Aponte Lazú decided on his own initiative to bring codefendant Meléndez García, his girlfriend from Juncos Ward, to help in the matter. Aponte Lazú offered to help buy Meléndez García a new house with the crime proceeds. At a subsequent date but still prior to the date of the carjacking, Aponte Lazú requested $200.00 from Rosario and Montalvo "on the house"[6] to "get cold blood" (criminal frame of mind) prior to the crime and purchase drugs. Rosario agreed and advised that another person who was "crazier than" Aponte Lazú was going to participate in addition to Papo. That person was codefendant Wilfredo López Morales, a.k.a. "Freddy." As the final preparations were being made, Aponte Lazú told codefendant Meléndez García to leave her eight-year-old son in school, Víctor, on the date of the hit. Meléndez Garía originally agreed but brought him along anyway because on that particular day there was no school because of a field day.

On the morning of the conspiracy, June 20, 1995, Aponte Lazú met codefendant Meléndez García in the town square of Humacao. To his unpleasant surprise, she had brought her son Víctor with her. Aponte Lazú went to see Rosario and Montalvo at the college but they could not see him; they had other matters to attend to. Aponte Lazú returned to the town square and saw Papo, Baez Jurado, coming with López Morales. Papo forgot to bring the weapon. Aponte Lazú returned to the school and was informed by Rosario that Edna was going to be at a doctor's office "down ahead by the college." (Docket No. 559, Tr. at 84, 11–17–97.) Aponte Lazú believed that the crime was going to be easier to commit because Edna was coming to town obviating their having "to go up to her house." Id. All four code-

---

4. Edna was married and was the mother of a four-month old baby.

5. The owner needed the cash to pay past-due payrolls and injection of cash. Only around

$47,000.00 of the agreed upon price was actually paid.

6. Extra money not deducted from the $25,-000.00.

fendants, as well as Víctor, then roamed the street. Edna's car suddenly appeared. Aponte Lazú was surprised to see that she was with a baby. No one had informed him about the baby. Papo informed Aponte Lazú that Rosario and Montalvo had told him there was a baby. Edna took the baby carriage out of the car and entered a doctor's office. While Edna was at the doctor's office, Aponte Lazú proceeded with the group of codefendants to a supermarket, Supermercado del Este, located nearby and purchased a knife.

While waiting for Edna to finish at the doctor's appointment, Aponte Lazú got acquainted with "Freddy," codefendant López Morales, who was from a halfway house in Juncos and was surprised to know that Freddy knew his girl friend Ada Meléndez. Freddy informed that he is hooked on cocaine. Edna left the doctor's office, and after making a phone call, moved toward her car pushing the baby stroller. Aponte Lazú and Meléndez with Víctor coordinated their movements so as to arrive at the car at the same time as Edna. Aponte Lazú commented to Edna about the "pretty baby", and Meléndez asked about the age of the baby. After Edna told then the baby was four months old and placed the key in the car's lock, Aponte Lazú got near her and placed the knife at her ribs. Aponte Lazú forced Edna into the car. "Papo" and "Freddy" suddenly appear with gloves on; they are seated in the back with Víctor and Edna; the knife was given to Papo. Meléndez placed the stroller and the baby protective seat in the trunk of the car. The baby was given to Edna. Aponte Lazú drives off the car. The carjacking is thus consummated. A bank card was taken from Edna's purse together with $26.00. Edna informed them that only $70.00 remain in the account of the card. The combination to access the card was requested by Aponte Lazú and was provided by Edna, combination numbers 1, 2,3, 4.

After a while Aponte Lazú asked Edna for the $200,000.00 dollars she had somewhere in her possession. Edna stated she was a poor girl. Aponte Lazú then insisted on the $200,000.00 she was holding for Fonsi. Edna stated, "I turned the money over a couple of weeks before Fonsi was killed." [7] (Edna insisted on the version of having previously delivered the money to Fonsi up to the moment she was killed.) Ada Meléndez was ordered by Aponte Lazú to slap Edna. Ada complies. (Aponte Lazú heard the slaps.) Afterwards the group proceeded to Buena Vista Ward where Aponte Lazú proceeded to buy drugs (crack, marijuana, and heroin).Codefendants, while continuing to terrorize Edna, all consumed the drugs that are mixed by Meléndez.

The court skips the gory terror details of what Edna suffered between the purchase of the drugs and the arrival of the group at the Guayanez River where Edna was eventually killed. On the way to the river, Edna was further slapped several times and threatened with the killing of her baby with the knife or by smashing the baby against a tree and/or against the floor. Before the car reached the river, it got stuck in a sugar cane bank; all then exited the car. Again Edna was terrorized with slaps and pulling of her hair (Aponte Lazú). Edna was further again threatened with the killing of her baby. She was ordered by Aponte Lazú to sit on a towel after they all go to a secluded area provided by bamboo trees. She insisted that she has delivered the money. She was asked intimate personal questions by Aponte Lazú. Papo had the knife and asked Edna to take her clothes off. Papo sucked her breasts. Aponte Lazú then takes over and was the first to rape her. Others follow one by one. They (male codefendants Aponte Lazú, "Freddy", and "Papo") place young Víctor, eight years old, on top of naked Edna. Ada was in the meantime in the car with the crying baby.

After the rape, Edna was ordered to put her clothes back on. Her baby was again threatened to be killed against the bamboo trees (Aponte Lazú) and with a knife (Papo). More slaps and fist hits were delivered to Edna. She was eventually dragged to the

---

7. Docket No. 559, 11–17–97, Tr. at 104. Edna was later asked how she knew that Fonsi was killed.

river by "Freddy" on orders from Aponte Lazú; Papo asked Freddy to drown Edna. Edna fought for her life, grabbing Freddy by the neck. Aponte Lazú then asked Papo who had the knife in hand to help Freddy. Papo entered the river and proceeded to slit Edna's throat. Papo told the others he had killed her. The body floated down the river.[8]

Ada Meléndez García, who remained in the car, was very annoyed when informed that Víctor "had scored" on Edna. She did not ask anything about Edna.

The codefendants then proceeded to work on removing the stuck car from the sugar cane field. The car jack of the vehicle was used[9] together with loose bamboo sticks to disengage the stuck car from the mud.

### B. Corroborating Evidence

Although the testimony of the codefendant was the principal basis to prove the crime, the court briefly sets forth some of the corroborating evidence presented at trial. Aponte Lazú was observed days before the car jacking at the school with Rosario. (Witness Roldan Flores, Docket No. 597, Tr. at 27–29, 12–8–97.) After the crime, the codefendants went to "Me Salve," a retail store in Las Piedras. Codefendants Meléndez and Aponte Lazú were observed there. (Witness Maribel Cruz Medina, Docket No. 535, Tr. at 21–24, 11–6–97.) Freddy and Papo stayed in the car. (Testimony of Aponte Lazú.) Codefendant Aponte Lazú was photographed by a security camera while withdrawing money from a bank machine using Edna's bank card, (Ex. 10). The receipt of the bank transaction made by Aponte Lazú was found in a garbage can at Ada Meléndez García's house, (Ex. 25). Baby clothes of Edna's baby were found at Ada Meléndez García's residence, (Ex. 70). An index card with the

address of codefendant Wilfredo López Morales was also found at Ada Meléndez García's house, (Ex. 64). After the car jacking on the same afternoon, Aponte Lazú and another taller person were observed in front of Ada Meléndez' house having difficulty with the alarm of a black car. Furthermore, sounds of a baby crying came from Ada Meléndez García's house.[10] Later that same evening after Edna's baby choked while drinking from a bottle, Aponte Lazú, Meléndez, Baez Jurado, and López Meléndez visited a hospital in Caguas. Codefendants Meléndez and Aponte Lazú took the baby into the hospital while the other codefendants (Papo and Freddy) remained in the car. (Testimony of Aponte Lazú, Docket No. 559, Tr. at 141–42, 11–17–98.) A doctor recalled the baby receiving treatment at the hospital while accompanied by codefendant Meléndez García with Aponte Lazú remaining nearby. (Dr. Víctor Ramírez Alta, Docket No. 543, Tr. at 431–44.) Aponte Lazú later in the evening took the baby from Humacao to Luquillo with Freddy, López Morales. On the way he suffered a car accident. Freddy hid when he noticed people coming toward the car.[11] Witnesses identified Aponte Lazú as suffering a car accident that evening. (Antonio L. González, Docket No. 599, Tr. at. 11, 12–9–97.)[12] Aponte Lazú was caught by Edna's husband driving Edna's car later that night. The husband identified the car, while looking for his wife. While chasing Aponte Lazú, he was able to turn off the ignition of Edna's car using an extra alarm signal of the car which he had in his possession. Codefendant Aponte Lazú had with him jewelry belonging to Edna.[13] (Ex. 9, ring, bracelet with the name of "Edna".)

There is also strong circumstantial evidence linking Rosario and Montalvo to

---

8. Only the torso of Edna was recovered several days latter. The head never appeared.

9. Months after the car jacking, the FBI recovered the jack of the vehicle on directions provided by then cooperating codefendant Aponte Lazú. (Ex. 43.)

10. The next door neighbor of Ada Meléndez García remembers a short person and a tall male person were having difficulty with the alarm of a dark car "in front of Ada Meléndez' house".

(Pablo Hernández, Docket No. 583, Tr. at 117–119, 12–1–98.)

11. Testimony of Aponte Lazú, Docket No. 562, Tr. at 22, 11–18–98.

12. The witness insisted that Aponte Lazú was alone in the car with the baby.

13. The knife used and a yellow t-shirt used by Freddy this day were among the items recuperated in the car. Ex. 8 and 78, respectively.

Aponte Lazú. They were housed together at the same penal halfway house in Humacao. They were together prior thereto at a halfway house in Punta Lima, Naguabo. (Juan Guillermo Roldan's testimony, Docket No. 597, Tr. at 9–30, 12–8–95).

Circumstantial evidence also linked Edna to codefendants Rosario and Montalvo. She was a student at American City College where Rosario and Montalvo worked as counselor and instructor, respectively. Both had access to school records. On June 20, 1995, Rosario knew and informed to Aponte Lazú that Edna was going to a doctor's appointment "down ahead by the college."

Plenty of evidence was provided by other sources, other than Aponte Lazú, as to Rosario's drug operations. The owner of the school (José Santiago, Docket No. 569,Tr. at 6–20 11–12–98), testified that Rosario purchased 49% of the school in cash ($47,000.00) in small denominations. No documents were drafted as to this transaction. (No reasonable explanation as to the source of the money was provided since Rosario was then in custody at a halfway house in Humacao; prior thereto, he was at another halfway house in Naguabo.) Rosario was the owner of a drug point in Juncos. While in jail the drug point was operated by "Fonsi" the brother-in-law of Rosario. (Juan G. Roldan Flores, Docket No. 597, Tr. at 13, 12–8–98.)

Edgardo Ortiz Piñero further corroborated Rosario's drug operations and the link to Edna. Ortiz Piñero was a convicted cooperator who knew codefendant Rosario. They had known each other since they were housed together at the federal penitentiary at MDC Guaynabo, P.R. Rosario told Ortiz Piñero that he was having difficulty with Fonsi about the drug points and that when Fonsi was killed he owed Rosario money. Further, Rosario told Ortiz Piñero that "he (Rosario) tried to get the money from a female friend that Fonsi had … Willie the barber" was also present. (Ortiz Piñero, Docket No. 554, Tr. at 19–20, 11–14–98.)

14. The testimony of Aponte Lazú is admissible under Fed. R. Ev. 801(d)(2)(E) (hearsay evidence admitted as a "statement by a co-conspirator of a

## III. THE STATEMENT MADE BY THE VICTIM'S FATHER

Samuel Rivera is the father of the murder victim Edna L. Rivera Hernández. He was devastated by the trial testimony of Aponte Lazú, narrating statements by codefendants Rosario and Montalvo, that Edna was holding drug money for Fonsi (Rosario) because she was Fonsi's lover (Montalvo). These facts totally shattered the reputation of the victim.[14]

The day after the verdict the victim's father was interviewed by Teleonce, T.V. Channel 11, News. Mr. Rivera said the following:

"I agree … That they were found guilty; but what I don't agree with is that my daughter came out like a trafficker, because if they had told the press, like they told me, that she was innocent, that she didn't have anything to do with that, I would be more … more [satisfied] … they themselves, the investigator [José Torres] told me 'Don Samuel your daughter didn't have anything to do with this, she's innocent" but why didn't they say so to the press …' (Docket No. 654, Translation of videotape of Channel 11 News, 12–13–97).

At the hearing held on March 25, 1998, (Transcript at Docket No. 637), Mr. Rivera stated the following in response to counsel questions:

Q: You knew that the agent [José Torres] had investigated your daughter and had found no evidence that she had been involved with drug money, that she was innocent.

A. Yes, Sir.

A: He told to me "Sometime during the trial."

(Docket No. 637, Tr. at 7.)

Q: It is your testimony that what agent Torres told you was that there was no evidence that the government did not find any evidence that she was involved with drug trafficking.

party during the course and in furtherance of a conspiracy"). *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

A. He didn't mention the government. He said that they had investigated. That they had investigated and that they found no evidence that she had been involved with Wilfredo and ... what is the other name. I can't recall their names. The last two.

Q: Wilson Montalvo and Ralph Rosario.

A: That she was not involved with them or with the money.

(Docket No. 637, Tr. at 16–17.)

## IV. THE LAW

*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Motion for new trials (newly discovered evidence).

Fed.R.Civ.P. 33.

A. Alleged *Brady* violation

■ *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holds that due process requires the government to disclose evidence favorable to an accused upon his request when the evidence is material to guilt. The evidence must be produced independently of whether or not the defendant requests the evidence. *United States v. Agurs,* 427 U.S. 97, 107–111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); the obligation includes information that could be used to impeach a government witness. *Giglio v. U.S.,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The government's obligation to disclose favorable evidence to the defendant, however, is limited to evidence that is "material" to the defendant's guilt or punishment. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; the evidence is "material" if there is a reasonable probability that the evidence would have changed the outcome. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (plurality opinion). The question is whether in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). The defendant must show that the (suppressed) evidence could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict. *Id.* "[T]he mere possibility that ... undisclosed information might have helped the defense or might have affected the outcome of the trial" is insufficient and will not pass muster. *Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392.

■ Lack of disclosure of evidence that is not admissible at trial is deemed not "material" under *Brady;* hence failure to disclose it will not be considered a *Brady* violation. *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995) (non disclosure of inadmissible polygraph examination not reasonably likely to result in a different outcome); *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir.1983) (inadmissible evidence held not material for *Brady* purposes). *See also United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989) (inadmissible opinion evidence not *Brady* material).

The statements alleged by made by local policeman José Torres to the father's victim were mere layman's opinion as to the victim's connection with drugs. "Don Samuel your daughter didn't have anything to do with this. She's innocent." (Statement made by the victim's father to Channel 11 News, Docket No. 654.) When Torres spoke to Don Samuel, the policeman was providing his opinion as to the credibility of the hearsay statement provided by the co-conspirator Aponte Lazú attributed to Ralph Rosario Diaz (that Edna had $200,000.00 of Fonsi's drug money owed to Rosario Díaz), and to Wilson Montalvo Ortiz (that she was Fonsi's lover). José Torres was also providing an opinion as to the veracity of the admission made by Ralph Rosario Díaz to Edgardo Ortiz Pinero that Rosario Diaz attempted to recuperate the money from a "female friend" of Fonsi.

■ Opinion testimony on the veracity of the testimony of another witness is not admissible. *United States v. Akitoye,* 923 F.2d 221, 224 (1st Cir.1991) ("It is not the place of one witness to draw conclusions about, or cast aspersions upon another witness' veracity"). *See also United States v. Sullivan,* 85 F.3d 743 (1st Cir.1996); *United States v. Cortez,* 935 F.2d 135, 139 (8th Cir.1991) (trial

court abused discretion in allowing opinion testimony of law enforcement officer concerning truthfulness of testimony of a witness). Allowing opinion testimony as to the veracity of a witness under Federal Rule of Evidence 701 would turn the witness providing the opinion "into a thirteenth juror." *United States v. Anderskow*, 88 F.3d 245, 250 (3rd Cir.1996).

■ Finally, the opinion testimony of the policeman does not even pass the test for authorizing layman opinion under Rule 701 established by the court in *Swajian v. General Motors Corporation*, 916 F.2d 31, 36 (1st Cir.1990). For opinion testimony of a layman to be discretionarily admitted by a trial court three elements must be met: "First, the witness must have personal knowledge of the facts for which the opinion is to be derived. Second, there must be a rational connection between the opinion and the facts upon which it is based. Third, the opinion must be helpful in understanding the testimony or determining a fact in issue." The policeman's opinion fails to comply with most if not all of the criteria required. José Torres only had information regarding Edna from his investigation of the crimes against her. He had no personal knowledge regarding Edna's activities or relationship while she was still alive. Without such facts, a rational connection cannot be drawn between José Torres' opinion and the necessary facts. Most importantly, as explained below, this opinion would have been of no assistance to the jury because Edna's involvement with drugs or Fonsi constituted no necessary fact to the crimes with which defendants were charged, *and*, more than substantial evidence was presented to the jury to explain the conspiracy and its results.

■ The court, therefore, determines following the mandate of the Court of Appeals in *United States v. Ranney*, 719 F.2d at 1190 (1st Cir.1983) ("inadmissible evidence is by definition not material [for Brady purposes]"), that the opinion testimony of the policeman José Torres is therefore not "material", hence no *Brady* violation occurred.

On the date of the hearing held on the motion, Samuel Rivera modified the original version of his statement given to the Teleonce reporter by stating that he was informed that the government had "no evidence" [15] that Edna was involved in drug trafficking or that she was involved with codefendants Rosario Díaz or Montalvo Ortiz. (Docket No. 637, Tr. at 16–17.) The above statement clarifies and underscores that the opinion of José Torres is not based on any nondisclosed or newly discovered evidence in the case other than the evidence presented through the testimony of codefendant Aponte Lazú and witness Ortiz Piñero. Assuming that policeman Torres statement to the victim's father that Edna was not involved in drugs meant that to Torres the statements of Aponte Lazú and Ortiz Pinero were unreliable or insufficient to conclude that Edna was in fact holding drug money, the matter remains an opinion, or as the United States expressed in its motion, a statement that there was absence of evidence "or limited evidence" as to this particular fact. In *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801, 823 (10th Cir.1991), the Court of Appeals stated that *Brady* "does not require the prosecutor to divulge every possible shred of evidence that could considerably benefit the defendant." Further, in *United States v. Bagley*, 473 U.S. at 675 n. 7, 105 S.Ct. 3375, the Supreme Court stated that "a rule that a prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would pose an impossible burden on the prosecutor." Requiring the United States to make an affirmative statement regarding its lacks of certain evidence is beyond the scope of *Brady*, and will not be demanded of the United States by this court.

Moreover, there was no harm as to a potential miscue (nondisclosure of *Brady* material) because both defendants Rosario and Montalvo argued vehemently in their closing statements that there was no evidence that Edna was involved with drug money and hence, this suggested a conclusion that

---

**15.** A statement made by Torres "sometime during trial" that there was "no evidence found" as to Edna when early during trial Aponte Lazú had already testified as to the matter is interpreted by the court to mean that no credible evidence was produced.

Aponte Lazú lacked credibility. (Docket No. 636, Tr. at 24–28.) The absence of evidence was thus brought to the attention of the jury and no *Brady* violation can therefore follow. *United States v. Rossy,* 953 F.2d 321 (7th Cir.1992).

In conclusion, the alleged due process error for lack of disclosure of *Brady* related evidence was not committed in the instant case.

B. New Trial. Fed.R.Crim.P. 33.

Defendants further request a new trial based on the newly discovered evidence provided by Mr. Samuel Rivera to Teleonce, (Docket No. 654), and stated at the March 25, 1998, hearing (Docket No. 637). The standard for new trial motion under Rule 33 based on newly discovered evidence is well known:

■ "A motion for a new trial based on newly discovered evidence will not be allowed unless the movant establishes that the evidence was (i) unknown or unavailable at the time of trial, (ii) despite due diligence, (iii) material, (iv) likely to result in an acquittal upon retrial." *United States v. Tibolt,* 72 F.3d 965, 971 (1st Cir.1995), *cert. denied,* 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996). *See also United States v. Montilla–Rivera,* 115 F.3d at 1064–65; *United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980); *United States v. Rothrock,* 806 F.2d 318, 322 (1st Cir.1986); *United States v. Natanel,* 938 F.2d 302, 313 (1st Cir.1991); *United States v. Benavente Gomez,* 921 F.2d 378, 382 (1st Cir.1990). If any of the required factors are missing, the request under Rule 33 must be denied. *Natanel,* 938 F.2d at 313. Further, "a motion for a new trial based upon alleged newly discovered evidence 'is not regarded with favor and should only be granted with great caution.'" *United States v. Muldrow,* 19 F.3d 1332 (10th Cir.1994), *cert. denied,* 513 U.S. 862, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994) (quoting *United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.)), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991).

■ As analyzed above, opinions by lay persons about the credibility of witnesses are not authorized under Federal Rule of Evidence 701, *United States v. Akitoye,* 923 F.2d at 224; *United States v. Sullivan,* 85 F.3d at 744; *United States v. Cortez,* 935 F.2d at 139. Since opinion evidence cannot be admitted, it is not "material" for the purpose of a new trial motion under Rule 33. *United States v. Ranney,* 719 F.2d at 1190; *Wood v. Bartholomew,* 516 U.S. at 5–6, 116 S.Ct. 7. Finally inadmissible evidence will not as a matter of law result in a "different outcome at trial." *Bartholomew,* 516 U.S. at 8, 116 S.Ct. 7. The factors of "materiality" and "likely to result in acquittal" are missing in this case. The new trial request under Rule 33 must be denied because if any of the required factors are missing, the new trial motion fails. *Natanel,* 938 F.2d at 313. The request for new trial is **DENIED.**

IT IS SO ORDERED.