Revised July 22, 1999

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————————

No. 98-20575

————————————————

SAM FELDER, JR.,
also known as Sammie Felder,

Petitioner-Appellant,

v.

GARY L. JOHNSON, Director,
Texas Department of Criminal Justice, Institutional Division

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

June 30, 1999

Before HIGGINBOTHAM, JONES, and DENNIS, Circuit Judges.[1]

EDITH H. JONES, Circuit Judge:

Sam Felder, a death row prisoner in Texas, appeals the district court's denial of his petition for a writ of habeas corpus. He raises numerous issues, three of which are discussed in depth in this opinion. First, Felder challenges the constitutionality of the "Texas waiver rule," which -- until it was abrogated last year -- treated a criminal defendant's admission of

_____

[1]     Judge Dennis concurs in the judgment.

guilt during the punishment phase of his trial as a guilty plea that waived all guilt-phase trial errors. This claim is <u>Teague</u>-barred. Second, Felder argues that the prosecution violated his due process rights by suppressing the arrest record of a government witness. Third, Felder argues his representation was constitutionally deficient. Because these claims and the others raised by Felder are meritless, the district court's denial of habeas corpus is affirmed.

## I. Facts and Procedural Background

Felder's habeas petition arises from the third time he was convicted and sentenced to death for the 1975 murder of James C. Hanks. The first two convictions were reversed on appeal or collateral review.[2] The third conviction occurred in 1989 and was affirmed by the Texas Court of Criminal Appeals in 1992.[3]

Testimony at Felder's third trial established that James Hanks, a 41-year-old quadriplegic, was fatally stabbed with scissors in the temples and neck -- among the few areas of his body in which he could feel pain -- in the early morning hours of March 14, 1975. Because of his quadriplegia, Hanks lived in a Houston apartment complex for the disabled where he could receive frequent care and services. That morning, when an attendant came to reposition Hanks as he slept, she discovered that Hanks's door was

---

[2]<u>See</u> <u>Felder v. McCotter</u>, 765 F.2d 1245 (5th Cir. 1985); <u>Felder v. State</u>, 758 S.W.2d 760 (Tex. Crim. App. 1988).

[3]<u>See</u> <u>Felder v. State</u>, 848 S.W.2d 85 (Tex. Crim. App. 1992), <u>cert. denied</u>, 510 U.S. 829 (1993)

2

open, though she had closed it on her previous stop two hours before. (Because Hanks's mother, who normally lived with him, was temporarily in the hospital, his apartment door was being left unlocked that week.)

Hanks was found in his bed, with his head contorted into an awkward position. His breathing was very faint, and he had wounds on the sides of his head.[4] The mattress was bloody. Hanks's wallet, which he kept under his pillow when he slept, was missing. The pillow was on the floor. Also missing was a pair of stainless-steel surgical scissors that was usually kept on a table near Hanks's bed. Hanks, comatose, was taken to a hospital and placed on life support. When it was later determined that Hanks was brain dead, he was removed from the life support system.

Felder worked for the company that provided services to the disabled residents in Hanks's apartment complex. He was an attendant whose duties extended to about fifteen residents, including Hanks. On the day before Hanks was found stabbed, Felder worked until 2:00 or 3:00 P.M. He was scheduled to work the day Hanks was found, but he did not report to work that day or later, or ever make arrangements to receive his last paycheck. Felder was arrested one month later in Idaho Falls, Idaho, when he was unable to produce valid identification during a traffic stop and found to have a concealed .38 caliber pistol.

---

[4]There were ten wounds on Hanks's temples and neck. A medical examiner testified that the cause of death was a stab to the left temple that had penetrated into Hanks's brain by 2½ to 3 inches. A hospital summary noted that "brain was extruding" through this wound.

Edith Cobb testified that she had seen Felder in Denver for "a couple of weeks" in late March and early April -- after Hanks's death and before Felder's arrest.  Cobb had met Felder in August 1974 and helped him get a job in Denver before he returned to Houston in November 1974.  When Felder re-appeared in Denver in March 1975, Cobb asked Felder if he would like her to get him another job.  Cobb testified that Felder told her "he had killed a man in ... Houston, and that he couldn't get a job."  Felder told Cobb that he had been working in some kind of hospital and had seen a paralyzed man with a lot of money.  After getting off of work in the afternoon, Felder returned at 2:00 or 3:00 A.M., armed with a .38 caliber handgun, to rob the man.  When Felder tried to take the money, the man woke up, recognized him, and, calling him by name, asked Felder what he was doing.  Felder then grabbed a pair of scissors next to the bed and "started stabbing him in his head and throat and back and forth and back and forth and back and forth and then he took the pillow and was -- kind of smothered -- the man was crying and hollering, please don't hurt me, and ... he just kept stabbing him back and forth...."  When it looked like the man was still breathing, Felder stabbed him more times.  Finally, when it looked like the man was dead, Felder took the money, over $300, and drove off in his car, throwing the scissors out the window on his way home.  That day, his brother took him to the airport, and Felder flew to Denver, having packed the pistol in his suitcase.  Cobb testified that Felder was "kind of laughing" when he recounted

4

the killing.  When she asked Felder why he had to kill the man, Felder said, "a dead man tells no tales."

Cobb saw Felder frequently over the next several days. He told her that he called his sister in Texas every day to ask whether the police were looking for him.  Eventually, Felder heard from his mother that he should not come back to Texas because he was wanted by the police.  Cobb last saw Felder on April 9, 1975, five days before he was arrested in Idaho.

After the jury found Felder guilty of capital murder, Cobb testified in the punishment phase of his trial.  She described other crimes Felder told her he had committed in Denver.  The jury answered both special issues in the affirmative, and Felder was sentenced to death.

After his conviction and sentence were affirmed on direct appeal, Felder filed a habeas petition in state court.  The state district court's denial of relief was affirmed by the Court of Criminal Appeals in 1995.  Felder's federal habeas petition was denied by the district court in 1998.  The district court granted a certificate of probable cause.  Felder now appeals the denial of habeas relief.

## II. Standard of Review

This case is governed by pre-AEDPA habeas standards because Felder's petition was filed before April 24, 1996.  See Green v. Johnson, 116 F.3d 1115, 1120 (5th Cir. 1997).  This means that state-court fact findings are binding on federal courts when

5

they are "fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994) (amended 1996). Legal questions, however, as well as mixed questions of law and fact, are reviewed de novo. See Johnson v. Puckett, 176 F.3d 809, 814 (5th Cir. 1999).

The district court in this case mistakenly recited AEDPA standards. Yet, because the record is complete, and virtually every issue must be reviewed de novo, we need not remand the case for further fact findings. Cf. Magouirk v. Phillips, 144 F.3d 348, 362-63 (5th Cir. 1998) (remanding on fact-based claims where state trial transcript was missing from federal record and magistrate judge incorrectly applied heightened, AEDPA-level deference).

## III. The Texas Waiver Rule

At the time of Felder's trial, Texas law treated a defendant's admission of guilt during testimony in the punishment phase of a bifurcated trial as waiving for appeal any guilt-phase trial errors. See McGlothlin v. State, 896 S.W.2d 183, 186 (Tex. Crim. App. 1995); DeGarmo v. State, 691 S.W.2d 657, 660-61 (Tex. Crim. App. 1985). This procedure, known as the DeGarmo doctrine or "Texas waiver rule," was abrogated by the Texas Court of Criminal Appeals in December 1998. See Leday v. State, 983 S.W.2d 713, 725-26 (Tex. Crim. App. 1998).

Felder argues that the Texas waiver rule -- when combined with the district court's refusal to grant a motion in limine for his proposed punishment-phase testimony -- unconstitutionally chilled his Fifth Amendment rights and compromised his Eighth

6

Amendment right to present all mitigation evidence. The waiver rule purportedly achieved this result through the excessive threat it posed to Felder if he decided to testify and risk opening the door to cross-examination questions about his guilt. While testifying in a bill of exceptions, Felder agreed that he wanted "to give testimony regarding [his] feelings about [his] remorse in regards to this offense," that he wanted to describe how he had "changed" since he had been to prison, and, in his own words, said, "I wanted to explain to the Court how I felt about things." He also said that he would deny Edith Cobb's allegations that he had committed other crimes in Denver.

The district court rejected Felder's claim. This court has never ruled on the constitutionality of the Texas waiver rule under the Fifth or Eighth Amendment.[5]

No matter how we characterize Felder's constitutional claims, however, they are not cognizable in this habeas corpus proceeding because of the anti-retroactivity rule of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989). Teague resolved that federal habeas relief may not be granted based on "new" rules of constitutional law. Under Teague a new rule is one in which the result was not "dictated by precedent existing at the time the defendant's conviction became final." Id. at 301, 109 S. Ct. at

_____

[5]In a habeas appeal related to Felder's first conviction, this court expressly refused to decide the question. See Felder v. McCotter, 765 F.2d 1245, 1251 (5th Cir. 1985).

7

1070 (plurality opinion) (emphasis in original); see also Lambrix v. Singletary, 520 U.S. 518, 527-28, 117 S. Ct. 1517, 1525 (1997).

Felder's conviction and sentence became final for Teague purposes on October 4, 1993, when the Supreme Court denied his petition for certiorari after his conviction was affirmed on direct review in state court. See Caspari v. Bohlen, 510 U.S. 383, 390, 114 S. Ct. 948, 953 (1994). Thus, this court must "[s]urve[y] the legal landscape as it then existed and determine whether a state court considering [Felder's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." Id. (internal quotations and citations omitted). If not, then Teague's bar applies. Teague's only exceptions are for rules that would place certain primary conduct beyond the government's power to proscribe or bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. See O'Dell v. Netherland, 521 U.S. 151, 157, 117 S. Ct. 1969, 1973 (1997).

In this case, Teague clearly bars the relief Felder seeks, and neither of its exceptions is applicable. The Texas waiver rule, although unusual and now disavowed by the Texas courts, was not condemned by any Supreme Court authority and, indeed, was at least inferable from McGautha v. California, 402 U.S. 183, 91 S. Ct. 1454 (1971), vacated on other grounds by Crampton v. Ohio, 408 U.S. 941, 92 S. Ct. 2873 (1972).

8

In McGautha, the Supreme Court interpreted its prior opinion in Simmons v. United States, 390 U.S. 337, 88 S. Ct. 967 (1968). In Simmons, the Court had held that testimony given by the defendant during a suppression hearing could not be used against him on the issue of guilt during his trial. In McGautha, the Supreme Court explained that Simmons involved an unusual situation of pitting "another provision of the Bill of Rights" against the Fifth Amendment. See McGautha, 402 U.S. at 212, 91 S. Ct. at 1469 (quoting Simmons, 390 U.S. at 394, 88 S. Ct. at 976). The McGautha Court concluded that "the policies of the privilege against compelled self-incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt." Id. at 217, 91 S. Ct. at 1472. It also rejected the related argument about a defendant who is deterred into silence, concluding: "We do not think that Ohio was required to provide an opportunity for [the defendant] to speak to the jury free from any adverse consequences on the issue of guilt." Id. at 220, 91 S. Ct. at 1474. Although the Supreme Court since McGautha has precluded a unitary trial procedure in capital cases, bifurcation is normally understood as insulating the guilt-phase determination from broader punishment-phase testimony. See Gregg v. Georgia, 428 U.S. 153, 190-95, 96 S.

9

Ct. 2909, 2933-36 (1976) (plurality opinion). That is not the problem of which Felder complains.[6]

Relief is thus unavailable to Felder in federal habeas corpus because his entitlement to it would depend on establishing a "new" rule of constitutional criminal procedure.

## IV. *Brady* Claim for Impeachment Evidence

Felder argues that the prosecution violated Brady v. Maryland, 373 U.S. 85, 83 S. Ct. 1194 (1963), by not disclosing that its chief witness, Edith Cobb, had been arrested for forgery in 1982. On appeal, this Brady claim is directed toward only the sentence of death, even though Cobb testified during both the guilt and punishment phases.

The state habeas court concluded that evidence of an arrest without conviction was not Brady material because it would not have been admissible to impeach Cobb. In addition, it found that any suppression did not undermine confidence in the trial and cited cases to show that the "mere possibility" that an item "might have helped defendant" is insufficient to make it Brady material. The federal district court found that the evidence was inadmissible, and that, even if admitted, the evidence would not have changed the outcome of the trial.

---

[6]We also note the Supreme Court's recent decision in Mitchell v. United States, 119 S. Ct. 1307 (1999). In Mitchell, the Court held that a guilty plea does not waive the Fifth Amendment privilege against adverse inferences from failure to testify during the sentencing phase. This does not establish anything approaching the right Felder proposes.

This court reviews the district court's <u>Brady</u> determinations <u>de novo</u>. See <u>East v. Johnson</u>, 123 F.3d 235, 237 (5th Cir. 1997).

<u>Brady</u>'s requirement that the prosecution disclose exculpatory evidence does extend to information that could be used to impeach government witnesses. See <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). The suppressed information, however, must still be "evidence" that is "material either to guilt or to punishment." <u>Brady</u>, 373 U.S. at 87, 83 S. Ct. at 1197. Evidence is material "only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." <u>Wood v. Bartholomew</u>, 516 U.S. 1, 5, 116 S. Ct. 7, 10 (1995).

The Fifth Circuit has not clearly specified how to deal with <u>Brady</u> claims about inadmissible evidence -- a matter of some confusion in federal courts[7] -- except to reaffirm that

---

[7] In <u>Wood v. Bartholomew</u>, the Supreme Court did not declare squarely whether inadmissible information could be material evidence under <u>Brady</u>, even though the circuit courts had already developed various approaches to that question. The Court first noted that polygraph results, being inadmissible, were "not 'evidence' at all" and "could have had no direct effect on the outcome of trial." 516 U.S. at 6, 116 S. Ct. at 10. It proceeded, however, to discuss the merits of the Ninth Circuit's attempt to "get around this problem," and concluded that "mere speculation" about whether the information could have led defense counsel to "additional evidence that could have been utilized" did not meet "the standards we have established." <u>Id.</u>

Reactions to <u>Wood</u> have been as varied as the pre-<u>Wood</u> jurisprudence. Some courts read <u>Wood</u> to mean inadmissible information cannot be material under <u>Brady</u>. See <u>Hoke v. Netherland</u>, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996) (inadmissible statements are immaterial "as a matter of law"); <u>United States v. Montalvo</u>, 20 F. Supp. 2d 270, 277 (D.P.R. 1998). One circuit has concluded that <u>Wood</u> did not affect its practice of allowing inadmissible evidence to be material if it "would have led to admissible evidence." See <u>Wright v. Hopper</u>, 169 F.3d 695, 703 & n.1 (11th Cir. 1999). Another has followed <u>Wood</u>'s methodology, noting inadmissible evidence is "not '"evidence" at all,'" and then asking whether a link to
(continued...)

11

"inadmissible evidence may be material under Brady." Spence v. Johnson, 80 F.3d 989, 1005 n.14 (5th Cir. 1996) (citing Sellers v. Estelle, 651 F.2d 1074, 1077 n.6 (5th Cir. Unit A July 1981)). Thus, we ask only the general question whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different. See East, 123 F.3d at 237. In this case, the question is whether the disclosure of the inadmissible evidence of Cobb's arrest would have created a reasonable probability that Felder would not have been sentenced to death.

Felder argues that if the evidence of Cobb's arrest had been disclosed, attempts to follow up on the arrest would have led his attorneys to admissible impeachment evidence about Cobb's reputation for dishonesty in Denver.[8] In the habeas proceeding, Felder produced an affidavit from a Denver police officer saying in part: "During 1988 and 1989 (and perhaps before), Edith Cobb was known by the members of this community to be a dishonest person."

Two aspects of Cobb's testimony were relevant to the jury's punishment-phase decisions. First, Cobb testified during the punishment phase that Felder had told her of other crimes he

---

[7](...continued)
admissible evidence is based on more than "mere speculation." See Madsen v. Dormire, 137 F.3d 602, 604 (8th Cir.), cert. denied, 119 S. Ct. 247 (1998). Still another has done the same as the Fifth Circuit and hewed to its pre-Wood practice without discussing Wood's potential relevance. See Coleman v. Calderon, 150 F.3d 1105, 1116-17 (9th Cir.), rev'd on other grounds, 119 S. Ct. 500 (1998) (per curiam).

[8]On appeal, Felder wisely does not repeat his argument that the evidence of the arrest would itself have been admissible to impeach Cobb.

had committed after the murder. She recounted his description of his armed robbery of a barbershop in Denver. She also recounted his explanation that he was able to afford staying at a hotel in downtown Denver by burglarizing "the projects" to steal stereos and televisions, and that he carried a gun with him during these burglaries in case any of his victims woke up. These other crimes were relevant to the jury's punishment-phase determination that there was a probability Felder would "commit criminal acts of violence that would constitute a continuing threat to society." Second, some of Cobb's guilt-phase testimony was relevant to the jury's punishment-phase determination that Felder's conduct in causing Hanks's death was "committed deliberately." Cobb had supplied chilling details of the killing itself as described to her by Felder and also of his laughing as he described the killing.

This court finds that the shadow cast upon Cobb's testimony by potentially-discoverable evidence of her dishonesty does not "put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995); see also Strickler v. Greene, 119 S. Ct. 1936, 1953 (1999) (not material if there is only "a reasonable possibility that either a total, or just a substantial, discount of [a witness's] testimony might have produced a different result" (emphasis in original)). Other factors demonstrate that the introduction of evidence casting doubt on Cobb's honesty would not have created a reasonable probability

13

of a different sentence for Felder.  First, there was physical evidence to corroborate Cobb's second-hand description of the murder's deliberateness: chiefly the number of wounds, their severity, and their concentration in Hanks's neck and head. Second, Felder had a prior criminal record of burglaries, and he had a gun when he was arrested, both demonstrating his threat to society.  Third, Cobb's testimony about the additional crimes did not go unquestioned.  In fact, Felder's defense counsel highlighted the lack of any corroboration for Cobb's descriptions of the additional crimes.  He noted that the prosecution brought a police officer from Idaho to testify about the pistol Felder had when he was arrested, but brought nobody from Denver besides Cobb to testify about these other crimes.  Defense counsel also openly wondered at how Cobb had "miraculously remembered something else" and stressed that Cobb had not testified about these other crimes at either of Felder's two previous trials.  Cf. United States v. Amiel, 95 F.3d 135, 145 (2d Cir. 1996) ("Suppressed evidence is not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation omitted)).

This case is also distinguishable from East, on which Felder relies and in which this court found a Brady violation based on the suppression of a prosecution witness's criminal history. The witness in East testified at the punishment phase of East's murder trial that East had raped her at gunpoint, threatened to

14

murder her, and told her he had murdered several other women.  See 123 F.3d at 237-38.  Revelation of that witness's criminal history, however, would have led defense counsel to a report describing her mental illness: she "experienced bizarre sexual hallucinations and believed that unidentified individuals were attempting to kill her."  Id. at 238.  Thus, in East, the potential impeachment evidence related directly to the subject-matter of the witness's testimony, and her testimony about future dangerousness was more extreme than Cobb's because it accused East of "several" other murders.

The prosecution did not violate Brady because disclosure of Cobb's forgery arrest would not have created a reasonable probability that Felder would not have been sentenced to death.

## V. Ineffective Assistance of Counsel

Felder next asserts that his trial attorneys provided unconstitutionally deficient representation because they (1) failed to investigate and impeach the key prosecution witness, Edith Cobb; and (2) failed to investigate and present mitigating testimony from Felder's family.  In addition to these two grounds, Felder argues that his representation was rendered deficient by the prosecution's surprise tactic of introducing unadjudicated offenses during the punishment phase.

The test for defective representation is two-fold: whether counsel's representation was so objectively unreasonable and incompetent as to be constitutionally deficient; and whether

15

counsel's errors actually prejudiced the defendant by depriving him of a fundamentally fair trial.  See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).  The state court's findings of fact are binding so long as they are "fairly supported by the record," 28 U.S.C. § 2254(d)(8) (1994) (amended 1996), but the ultimate question of effective assistance is itself a mixed question of law and fact, reviewed de novo.  See Bryant v. Scott, 28 F.3d 1411, 1414 (5th Cir. 1994).  Relief may be denied if the defendant fails to establish either prong of the Strickland test. See id. at 1415.

Reviewing the claims of deficient representation, the federal district court found that the state court findings were supported by the record, and we agree.

On counsel's failure to investigate Cobb and impeach her testimony with evidence of her lack of credibility, it is sufficient to note that the standard for prejudice under Strickland is "identical to" the standard for materiality under Brady. Johnson v. Scott, 68 F.3d 106, 109-10 (5th Cir. 1995).  Because the impeachment evidence was not material under Brady -- as discussed above, in part IV -- failure to present it was not prejudicial under Strickland.

As for the mitigating evidence available from family members,[9] there is no reasonable probability that trial counsel's

---

[9]Felder summarizes 1994 affidavits from his family and friends as proof that, had they been called by the defense in 1989, they would have testified as follows:

16

deficient performance -- if any[10] -- yielded a different result or an unfair trial.  The addition of testimony from family members to buttress the mitigating character evidence already introduced would not have created a reasonable probability of a different result in the punishment phase.  This claim does not meet <u>Strickland</u>'s prejudice requirement.

Felder's final claim of ineffective assistance of counsel is odd because it focuses on the prosecution's conduct.  Felder argues that Cobb's testimony about unadjudicated offenses was such a surprise that it made effective cross-examination impossible and thus deprived him of effective assistance of counsel.  To the

_____

[9](...continued)
Felder was a "respectful and well-mannered person"; he was "quiet" and "got along well with others"; ... he was "a real good listener," who was "always kind [and] peaceful"; "everyone liked Sam"; he was not known to be the "type to argue, get in fights or act violent towards anyone"; "he was never disrespectful or mean"; "Sam was not violent and did not have a temper."

None of the affidavits makes any explicit mention of any contact with Felder after 1975.

[10]Rather than failing to present any mitigating evidence whatsoever, Felder's defense attorneys presented testimony from a psychiatrist and from three prison chaplains.  Unlike the family-member affidavits presented by Felder, these witnesses spoke about Felder's character since he had been incarcerated.  In his bill of particulars, Felder himself said he wanted to testify about how he had changed since 1975.  The theme of defense counsel's closing argument in the punishment phase was captured in this passage:

Folks, Sammie has changed.  All the evidence points to it.
Folks, some of you may not care.  Some of you may say, I don't care if he has changed, that was such a horrible crime, I'm killing him.  It's up to you.  All I have to ask you is if that's the way you feel about it, then please just disregard all the chaplains, disregard the psychiatric testimony, throw it out the window.

It is not obvious that the changed-man theme was an objectively unreasonable trial strategy.  Nor is it obvious that it would have been a better strategy to rely on family members and tell the jury that had just convicted Felder for a heinous murder something like "Sammie was never really that bad."  Furthermore, it could have been equally suspicious to combine the changed-man strategy with family testimony: "Sammie was never that bad, but he's much better now."

17

extent that this is a substantive claim that the introduction of unadjudicated offenses was unfair, Felder is procedurally barred from asserting it by his failure to object at trial on these grounds.[11] To the extent that Felder identifies ineffective counsel as "cause" for the failure to object, our discussion above makes clear that there was no Strickland prejudice from introduction of the unadjudicated offenses, meaning the procedural bar cannot be overcome.[12]

The district court did not err in finding that Felder had not met his burden of demonstrating ineffective assistance of counsel under both prongs of Strickland.

## VI. Other Claims

Felder raises three contentions that border on the legally frivolous: that executing him after two decades of delay is unconstitutional; that the trial court failed to define reasonable doubt; and that Texas's method of lethal injection violates the

---

[11]The trial transcript does not support Felder's claim that this ground of objection was apparent from context. Felder's counsel objected to Cobb's testimony about the burglaries on the grounds that it lacked detail and had no corroboration. The alleged armed robbery of the barbershop was objected to as being "generally irrelevant to this hearing."

[12]It is not clear whether Strickland prejudice would be sufficient to meet the prejudice required to overcome a procedural bar in habeas. Cf. Strickler v. Greene, 119 S. Ct. 1936, 1956 n.2 (1999) (Souter, J., dissenting in part) (Court treats habeas prejudice as synonymous with Brady materiality); Williams v. French, 146 F.3d 203, 210 n.10 (4th Cir. 1998) (unclear whether habeas prejudice is same as Strickland prejudice), cert. denied, 119 S. Ct. 1061 (1999); United States v. Dale, 140 F.3d 1054, 1056 n.3 (D.C. Cir. 1998) ("habeas prejudice may require a greater showing" than Strickland prejudice), cert. denied, 119 S. Ct. 794 (1999); Zinzer v. Iowa, 60 F.3d 1296, 1299 n.7 (8th Cir. 1995) (habeas prejudice "must be a higher standard" than Strickland prejudice). But without Strickland prejudice at a minimum, there is not even cause to overcome the procedural bar. See Turner v. Johnson, 106 F.3d 1178, 1188 (5th Cir. 1997); Ellis v. Lynaugh, 883 F.2d 363, 367 (5th Cir. 1989).

Eighth Amendment.[13]  This court has previously rejected such claims in similar or identical circumstances.  It was not error for the district court to deny relief on these claims.

Two of Felder's other claims were inadvertently not ruled on by the district court.  Under the circumstances, where they are easily resolved on the record and Felder already complains of the time this case has taken, we can affirm the district court's denial of habeas corpus.

The first of these two claims is that there was insufficient evidence of Felder's future dangerousness in the punishment phase of trial.  Given the facts recited above -- including the brutality of the murder itself, Felder's prior burglary convictions, and his possession of a concealed weapon upon arrest -- the contention that the evidence was insufficient must fail.

The second claim on which the district court did not rule is Felder's challenge to the prosecution's use of victim character evidence.  The state court found that Felder was barred from raising the victim character evidence because his counsel never objected to that testimony.  This is true with respect to only some of the testimony now invoked.  In any event, the Supreme Court has

---

[13]The lethal injection claim is procedurally barred.  Several circuits have applied habeas requirements to suits challenging methods of execution, even when they are denominated civil rights claims.  See Williams v. Hopkins, 130 F.3d 333 (8th Cir.), cert. denied, 118 S. Ct. 595 (1997); McQueen v. Patton (In re Sapp), 118 F.3d 460 (6th Cir.), cert. denied, 521 U.S. 1130 (1997); Felker v. Turpin, 101 F.3d 95 (11th Cir. 1996).  But see Fierro v. Gomez, 77 F.3d 301 (9th Cir.), vacated and remanded in light of new statute, 519 U.S. 918, 117 S. Ct. 285 (1996).

19

held that the Eighth Amendment poses no <u>per se</u> bar to a state's decision to allow victim impact evidence in the sentencing phase of a capital case. See <u>Payne v. Tennessee</u>, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991). The testimony about the victim here -- that Hanks "never refused anyone anything," "was always in good spirits even though he was disabled," and was "a very good natured person" who "didn't have any enemies" -- was no more inflammatory than what this court has allowed in other cases. See, e.g., <u>Westley v. Johnson</u>, 83 F.3d 714, 722 (5th Cir. 1996) (testimony about victim's "community volunteer service and other good deeds"); <u>Wiley v. Puckett</u>, 969 F.2d 86, 105 (5th Cir. 1992) (testimony that victim was "not a violent or mean person, that he was known in the community as 'Mr. Good Buddy,' and that he occasionally loaned small amounts of money"). Furthermore, the potential impact of the testimony must be considered in perspective with the facts of the crime itself. See <u>United States v. Hall</u>, 152 F.3d 381, 405 (5th Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 1767 (1999).

### VII. Conclusion

Because none of Felder's claims justifies granting habeas corpus relief, the district court's judgment is **AFFIRMED**.

**AFFIRMED**

20