Calvin Jerold BURDINE, Petitioner,

v.

Gary JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. CIV. A. H–94–4190.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 29, 1999.

Robert L. McGlasson, Attorney at Law, Decatur, GA, Mandy Jo Welch, Burr & Welch, Houston, for Petitioner.

Douglas Alan Danzeiser, Office of the Texas Attorney General, Austin, TX, for Respondent.

## ORDER

HITTNER, District Judge.

Pending before the Court is the Petition for Writ of Habeas Corpus filed by petitioner Calvin Jerold Burdine ("Burdine") and the Motions for Summary Judgment filed by respondent Gary Johnson. Having considered the motions, the submissions, the record and the applicable law, this Court determines that Burdine's petition for writ of habeas corpus should be granted and the respondent's motions for summary judgment should be denied.

## BACKGROUND

Burdine was indicted on June 1, 1983 in Cause No. 379444–A and tried in the 183rd District Court, Harris County, Texas for the offense of capital murder in connection with the death of W.T. "Dub" Wise ("Wise"). Wise was killed on April 17, 1983 during the course of a robbery committed by Burdine and another, Douglas McCreight.[1] On January 30, 1984 Burdine was convicted of capital murder. After the jury answered the two special issues affirmatively, the trial court assessed punishment at death by lethal injection pursuant to Tex. Penal Code Ann. § 19.03(a)(2). On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence on October 15, 1986. *See Burdine v. Texas,* 719 S.W.2d 309 (Tex.Crim.App. 1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

Burdine subsequently filed a state application for writ of habeas corpus pursuant to the Texas Code of Criminal Procedure article 11.07. The first state habeas appeal was denied on June 29, 1994. *See Ex Parte Burdine,* Cause No. 37944–A (183rd Dist. Ct. Harris County, Texas, June 29, 1994); *Ex Parte Burdine,* Writ No. 16,- 725–02 (Tex.Crim.App., Dec. 12, 1994). In December 1994, Burdine filed a second application for writ of habeas corpus. The trial court conducted an evidentiary hearing on February 3, 1995 on the issues of ineffective assistance of counsel, the constitutionality of a 1971 sodomy conviction against Burdine, and the allegation regarding whether Burdine's constitutional rights were negatively impacted by homophobic conduct during the trial. On April 3, 1995, the trial court (Judge Jay W. Burnett) entered extensive and detailed findings of fact and conclusions of law recommending that habeas corpus relief be granted based

---

1. The State of Texas did not prosecute McCreight for capital murder, despite evidence indicating that McCreight was the primary actor herein. Pursuant to a plea agreement, McCreight served an eight year prison sentence and was subsequently paroled.

on Burdine's allegation that trial counsel Joe Cannon ("Cannon") slept through a substantial portion of the trial. *See Ex Parte Burdine*, Cause No. 37944–B (183rd Dist. Ct. Harris County, Texas, April 3, 1995). The Texas Court of Criminal Appeals, in a one page, unsigned opinion agreed that "the trial court's findings of fact [regarding the sleeping of trial counsel] are supported by the record," but summarily proceeded to hold that Burdine "is not entitled to relief because he failed to discharge his burden of proof under *Strickland v. Washington*, 446 [sic; 466] U.S. 668[104 S.Ct. 2052, 80 L.Ed.2d 674] (1984)." *Ex Parte Burdine*, Writ No. 16,-725–06 (Tex.Crim.App. April 6, 1995). Three judges of the Texas Court of Criminal Appeals dissented in an opinion stating that "[t]he issue presented in this case has never been addressed by the United States Supreme Court nor by this Court . . . this Court has a duty to at least file and set this case so that we can consider the issue." *Id.*, (Maloney, J., dissenting; joined by Baird and Overstreet, J.J.). The dissenting opinion further disagreed with the majority opinion's decision to deny relief for its failure "to give deference to the trial judge who took testimony on this application and who had the duty to weigh the credibility of the testimony." *Id.*

This Court preliminarily agreed with the dissenting opinion and determined that further analysis of these claims was warranted based on the gravity of the punishment assessed. Thus, on April 10, 1995, Burdine's Motion for a Stay of Execution was granted. At that time, this Court further noted that the Texas Court of Criminal Appeals altogether failed to provide any justification for its rejection of the trial court's conclusions of law while approving the findings of fact. This Court was therefore forced to reexamine the record and the law in this case to determine whether the decision entered by the state court was constitutionally sound.

Burdine now seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254.

## APPLICATION FOR WRIT OF HABEAS CORPUS

This Court is authorized by 28 U.S.C. § 2254(a) to "entertain an application for a writ of habeas corpus on behalf of a person . . . [who] is in custody in violation of the Constitution or law of or treaties of the United States." 28 U.S.C. § 2254(e).

Burdine has presented the following issues to this Court in the instant application for writ of habeas corpus:

1. Whether the performance of petitioner's trial counsel, Joe Cannon, including sleeping during substantial portions of petitioner's trial, violated petitioner's constitutional right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments;

2. Whether the State of Texas has forfeited its right to execute petitioner under the Eighth and Fourteenth Amendment;

3. Whether the prosecutor's alleged homophobic remarks to the jury violated petitioner's rights under the Eighth and Fourteenth Amendments;

4. Whether the special issues provided a constitutionally adequate vehicle for jurors to consider mitigating evidence of petitioner's "non-triggerman" status;

5. Whether petitioner's jury could have given adequate mitigating effect to his childhood sexual abuse and an otherwise neglected youth in answering the statutory special issues;

6. Whether the prosecutor's equation of the terms "deliberate" and "intentional" was a violation of petitioner's rights under the Eight and Fourteenth Amendments;

7. Whether the petitioner's rights under the Sixth Amendment's confrontation clause were violated when the prosecutor elicited a great deal of allegedly highly incriminating hearsay about a non-testifying co-defendant's statements to police;

8. Whether the prosecutor's closing arguments during the punishment phase violated the Eighth and Fourteenth Amendments under *Caldwell v. Mississippi*, 472

U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985);

9. Whether this Court must conduct an evidentiary hearing on petitioner's Fifth Amendment claim under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) because the Texas Courts failed to resolve the factual dispute underlying this claim;

10. Whether the state could rely on petitioner's alleged unconstitutional 1971 sodomy conviction in support of its argument that petitioner posed a future danger to society.

## ANALYSIS

1. Whether the performance of petitioner's trial counsel, Joe Cannon, including sleeping during substantial portions of petitioner's trial, violated petitioner's constitutional right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments.

The state district court conducted an evidentiary hearing to consider Burdine's second state petition for writ of habeas corpus on February 3, 1995. The primary issue at this hearing was whether Burdine's attorney, Cannon, was asleep through substantial portions of his criminal trial. Burdine called a total of eight witnesses, including three jurors from his criminal trial and the clerk of court of the presiding Judge. The state called two witnesses, including Cannon. Because the evidence presented with respect to sleeping counsel is crucial to this Court's determination of Petitioner's ineffective assistance of counsel claim, each witness will be addressed in turn.

Daniel Strickland ("Strickland") was the jury foreperson at Burdine's trial. Strickland testified that on several occasions he saw Cannon "nod off or perhaps doze, ... catch himself dozing ... [he] just kind of dozed off for a few minutes." Although Strickland never watched Cannon for more than thirty seconds at a time due to his attentiveness to the on-going trial proceedings, he did note that Cannon's dozing occurred "before we [returned] the verdict, typically in the afternoon, after the lunch recess." During these periods of sleep "[t]here was either questioning [of witnesses by the prosecutor] or perhaps something being presented as evidence.... it [was] during the [trial] proceedings...." Strickland could not be sure how often Cannon slept, but he observed such conduct "more than two [times] but not more than five times."

A second juror, Myra Davis ("Davis"), testified that she noticed Cannon "nodding," with his eyes closed and chin on his chest, on the second day of trial. Davis recounted how Cannon's head would nod down and then "bounce up" after a short amount of time. More specifically, Davis recalled that there was a "bunch of nodding on the second day ... quite a bit in the afternoon; that it [would not occur] if they were talking to him [Cannon] or they were saying something to him.... As soon as the prosecutor would get on maybe a long spiel of talk for a while, it would start."

The third juror presented by Burdine, Craig Engelhardt ("Engelhardt"), testified that he observed Cannon's "nodding," as well. Engelhardt noted that Cannon would nod with his head down and eyes closed throughout the first and second phases of the trial. On one occasion, Engelhardt recalled how Cannon had to have been asleep because a clerk dropped a book and made a sharp noise, which startled Cannon, and when he "bobbed" his head up, his eyes were red. Engelhardt testified that on this particular incident Cannon had been asleep for approximately ten minutes. Moreover, Engelhardt related that Cannon's bouts of sleep occurred five to ten times during the trial.

Former prosecutor Ned Morris ("Morris") testified that he was the prosecutor for the state at Burdine's trial and that he never saw Cannon sleeping. Morris noted, however, that "most of the time" when he was questioning witnesses or seeking to admit evidence, his attention was focused

on the witness stand, piece of evidence, or "something else other than defense counsel." Indeed, Morris admitted that he was "looking at either the Judge, the witnesses or the jurors most of the time." Only "on occasion" would Morris "glance over to the defense side of the counsel table."

Former District Judge Joseph M. Guarino ("Judge Guarino"), who presided over Burdine's trial, testified that he had some memory of Burdine's trial but that his memory was not altogether clear. Judge Guarino did recall Cannon closing his eyes on multiple occasions during the trial and sometimes leaning back in his chair. However, Judge Guarino also testified that, as a general practice in his court, when one side's counsel was questioning a witness or presenting evidence, he would focus his attention on the lawyer questioning the witness and the witness stand and not on the other side's attorney. Further, Judge Guarino testified that he was responsible for drafting the charge to the jury and would do so by hand during the course of the trial. This task was in addition to his taking notes throughout the trial and filling in the docket sheets, which memorialized the trial proceedings.

Rose Marie Berry ("Berry") confirmed the recollections of Strickland, Davis and Engelhardt. Berry served as Judge Guarino's clerk from 1981 to 1984 and was the "head" deputy clerk assigned to the 183rd District Court during Burdine's trial. Moreover, she was present in the courtroom during the majority of the trial. Berry testified:

> ... He [Cannon] would drift off.... He was asleep. In the first few days probably not at all that I noticed. But toward the end of or the middle phase of the trial, he was getting tired. I saw it happened a lot.... He was asleep. He had his head down, not totally down, but down. He didn't lean back, but forward slightly.....
>
> ... I do know that he fell asleep and was asleep for long periods of time during the questioning of witnesses.

Berry further testified that Cannon was asleep "for about ten minutes ... at least ten minutes" on the longest instance that she remembered him actually sleeping. However, she also recalled that there were "lots of incidents" when Cannon slept for shorter periods of time and on more than one day of the trial. Berry stated she knew Cannon was asleep because "I saw his head going backwards and forwards the way people do when they fall asleep" and that Cannon would suddenly dart his head upward in a startled manner when he was awakened. "I didn't know that defense counsel was asleep until I sat there and watched him for a while and that's when I knew that he was actually asleep." Berry testified that her clerk's chair was approximately ten to twelve feet from defense counsel's chair in the courtroom.

On cross-examination by the state, Berry was adamant that Cannon had been asleep throughout portions of the trial: "I know when a person has his eyes closed and [is] concentrating and when a person has his eyes closed and is asleep ... Mr. Cannon was asleep." Berry further testified that as a long-time clerk of the court, she was familiar with Cannon's routine: "I know Joe Cannon. I had seen him before. I knew that he had this problem." Berry related how she had seen Cannon sleep on other occasions while inside Judge Guarino's courtroom such as during docket call and resets "in reference to the Burdine case." On redirect examination, Berry testified, once again, that she knew "that defense counsel was asleep and for long periods of time during the questioning of witnesses."

James Pillow ("Pillow"), the Court Coordinator for the 183rd District Court from 1981 to 1986, including during Burdine's trial, testified that he did not recall being in the courtroom for any of the actual Burdine trial proceedings. Pillow however, recalled a conversation with Morris concerning Morris' opinion that Cannon was incompetent. During that conversation Morris asked Pillow not to appoint

Cannon to any more capital cases because of questionable competence. Pillow responded that Morris should discuss the issue with Judge Guarino because only the judge appointed attorneys in capital cases. Pillow could not recall if the conversation with Morris occurred during or after Burdine's trial.

Carolyn Bonnin ("Bonnin"), another juror at Burdine's trial, testified on behalf of the state. Bonnin recalled that she was able to observe Cannon during the trial and that she never saw him asleep. Moreover, she never saw Cannon close his eyes nor did she see Cannon put his head down. On cross-examination, Bonnin admitted that she only occasionally looked at the defense table when witnesses were being questioned by the prosecutor or the prosecutor was presenting evidence.

Joe Cannon testified that he did not sleep during any portion of Burdine's trial. Instead, Cannon claims that he tends to close his eyes when thinking, and that during periods of deep concentration he would nod his head. Cannon testified further that he had never slept at any trial at which he was an attorney, including the 1979 Harris County capital murder trial of Carl Johnson, as discussed further *infra.*

In rebuttal, Burdine called attorney Philip Scardino ("Scardino"). Scardino's testimony was offered to impeach Cannon's credibility. Scardino testified that he was Cannon's second-chair counsel at the 1979 Harris County capital murder trial of Carl Johnson and that Cannon repeatedly fell asleep during the several days of individual voir dire during that trial. Scardino stated that Cannon's bouts of sleep often lasted up to "fifteen minutes or better" and that they frequently occurred in the afternoons.

The state district court (Judge Burnett) found the testimony of the three jurors, Strickland, Davis and Engelhardt, and the testimony of the Clerk of Court, Berry, to be the most credible. All of these witnesses observed Cannon "dozing" or actually sleeping at various times during the trial. From their testimony, the state district court determined that Cannon slept on numerous occasions for varying lengths of time, anywhere from thirty seconds to ten minutes in duration. Of the four witnesses, the court found Berry to be particularly compelling in her testimony:

> In addition to being credible and having no motive to misrepresent the truth, Berry had the best opportunity of any participant at trial to observe defense counsel during trial, as her testimony and Defense Exhibit # 1A [a map of the trial courtroom] demonstrates, she was approximately 10–12 feet from defense counsel. Unlike the trial judge, prosecutor, and jurors, Berry was not required to pay attention to witnesses who were testifying; indeed, from her vantage point, she could not even see the witnesses. Berry adamantly testified that she watched defense counsel continuously during the periods she observed him sleeping.

Based on the foregoing, the state district court found that:

> ... the great weight and preponderance of the evidence and testimony presented at the February 3, 1995, writ hearing requires this Court to enter a finding that defense counsel dozed and actually fell asleep during portions of applicant's trial on the merits, in particular during the guilt-innocence phase when the State's solo prosecutor, was questioning witnesses and presenting evidence.

In finding that Cannon repeatedly dozed and actually slept at trial, the state district Court did not discredit the testimony of Morris or Judge Guarino. Rather, the court noted that both witnesses admitted their attention was often not directed at defense counsel. Similarly, the court noted that juror Bonnin only "occasionally" glanced over at the defense table when Morris was presenting evidence and testimony. Finally, the court found the testimony of Cannon, that he never slept during portions of any trial, to be impeached by Scardino's testimony.

Based on these findings the state district court concluded: "The applicant has established per se ineffective assistance of counsel based on the allegation that defense counsel repeatedly dozed and/or actually slept during substantial portions of applicant's capital murder trial so that defense counsel was, in effect, absent and that such conduct by defense counsel is inherently prejudicial and thus no showing of prejudice is necessary." (Conclusion of Law # 1, at 18–9). The court thereafter adopted the reasoning and analysis of Burdine's Conclusions of Law as presented in his brief to the court. (Conclusion of Law # 2, at 19). Based on these findings and conclusions, the state district court determined that Burdine's conviction was unlawfully obtained. The court therefore recommended to the Texas Court of Criminal Appeals that relief be granted. (Conclusion of Law # 13, at 20). Of the state district court's fifteen conclusions of law, only these three were rejected by the Texas Court of Criminal Appeals' one-page majority opinion. However, the Texas Court of Criminal Appeals adopted the state district court's findings of fact in toto. The case is now before this Court.

■ Contrary to the state's contentions, this case is governed by pre-Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996), habeas corpus standards because Burdine's petition was filed before April 24, 1996.[2] *See Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding that AEDPA amendments to § 2254 apply "only to such cases as were filed after the statute's enactment"); *Felder v. Johnson,* 180 F.3d 206, 209 (5th Cir.1999) (same) (citing *Green v. Johnson,* 116 F.3d 1115, 1120 (5th Cir. 1997)). State court findings of fact are binding on federal courts when such findings are "fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1994) (amended 1996); *see also Johnson,* 180 F.3d at 209–10. Questions of fact are "basic, primary,

or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators....'" *Thompson v. Keohane,* 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (quoting *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (quoting *Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397, 97 L.Ed. 469 (1953))). The Supreme Court has reasoned that "a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer 'presumptive weight.'" *Thompson,* 516 U.S. at 111, 116 S.Ct. 457 (citing *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). To overcome this presumption of correctness, the party challenging the state court's findings of fact must establish by clear and convincing evidence that the "factual determination by the State court was erroneous." 28 U.S.C. § 2254(d)(8) (1994) (amended 1996); *James v. Whitley,* 39 F.3d 607, 610 (5th Cir.1994).

■ Conclusions of law, however, "as well as mixed questions of law and fact, are reviewed de novo." *Johnson,* 180 F.3d at 210 (citing *Johnson v. Puckett,* 176 F.3d 809, 814 (5th Cir.1999)); *see also Bryant v. Scott,* 28 F.3d 1411, 1414 (5th Cir.1994). "So-called mixed questions of fact and law ... require the application of a legal standard to the historical-fact determinations...." *Townsend,* 372 U.S. at 309 n. 6, 83 S.Ct. 745. The ultimate determination of ineffective assistance of counsel is a mixed question of law and fact, and thus qualifies for independent review by this Court. *Thompson,* 516 U.S. at 112–3, 116 S.Ct. 457. The inquiry, however, must begin with the underlying facts of the case as it requires this Court to apply those facts to the applicable law.

■ The state district court determined that Cannon had slept throughout numerous portions of Burdine's capital murder trial. These findings of fact were subse-

---

2. Even if the higher AEDPA standard applied to the instant petition, this Court has determined that it would reach the same conclu-

sion, *i.e.* that Burdine's petition should be granted.

quently adopted by the Texas Court of Criminal Appeals. Despite the state district court's and the Texas Court of Criminal Appeals' clear and unequivocal judicial determinations, the state continues to argue to this Court that Cannon did not sleep during trial. The state also contends that this Court must accept the Findings of Fact of the Texas Court of Criminal Appeals, not the Texas District Court. This argument is completely frivolous in the instant case because the Texas Court of Criminal Appeals *adopted* the Texas District Court's Findings of Fact in entirety. Moreover, the Texas District Court is the court that made the "determination[s] after a hearing on the merits of the factual issue[s]," and its findings are thus subject to the presumption of correctness. *Sumner v. Mata*, 449 U.S. 539, 546–7, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).[3] However, the state has not overcome or even approached the requisite burden of proof; *i.e.* shown by clear and convincing evidence that the state court's findings of fact are erroneous and the presumption of correctness does not apply. Indeed, the state has not presented any evidence to this Court which was not considered by the state district court in its Findings of Fact and Conclusions of Law. It is therefore conclusively established by the record presented to this Court and developed through an evidentiary hearing, the record and hearings in the courts below, and both Texas courts' explicit rulings that Cannon did, in fact, sleep on multiple occasions and for several lengths of time during Burdine's trial. Consequently, there is no question of fact to be addressed by this Court. The sole issue that remains, then, is the legal significance of Cannon's sleeping during trial. The inquiry requires this Court to apply the facts to the law (*i.e.* it is a mixed question of law and fact).

"It has long been recognized that the right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) *quoted in United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The Supreme Court has held that "[t]he bench mark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court has enumerated a two-prong test for determining the effectiveness of a counsel's performance. *Id.* In order to prevail on a claim of ineffective assistance of counsel, a petitioner must be able to demonstrate that his "counsel's performance [was] deficient (*i.e.* that counsel did not provide reasonably effective assistance under prevailing norms) and prejudicial (*i.e.* that errors by counsel actually had an adverse effect on the defense)." *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir.1995) (quoting *Anderson v. Collins*, 18 F.3d 1208, 1215 (5th Cir.1994)); *see also Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. Typically, a "failure to establish either deficient performance or prejudice defeats an ineffective assistance claim." *Seyfert*, 67 F.3d at 547 (citing *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052).

On the same day that *Strickland* was handed down, the Supreme Court issued its opinion in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic*, the Court stated that "[t]here are circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 104

---

**3.** *See also Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (Court of Appeals erred by not affording presumption of correctness to state trial court's factual findings); *Magouirk v. Phillips*, 144 F.3d 348, 362 (5th Cir.1998) (state trial court's findings entitled to presumption under § 2254(d)); *Craker v. Procunier*, 756 F.2d

1212, 1213–14 (5th Cir.1985) ("The state [habeas] trial court's ... factual findings are ... entitled to a presumption of correctness [under § 2254(d) ] .... [T]he Texas Court of Criminal Appeals did not reject the factual findings of the state trial court; it merely held that the facts as found did not entitle Craker to relief").

S.Ct. 2039. Therefore, "[i]n certain Sixth Amendment contexts, prejudice is presumed." *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052 (citing *Cronic*, 466 U.S. at 659 and n. 25, 104 S.Ct. 2039). In other words, certain circumstances of ineffective assistance of counsel only require the reviewing court to reach the first prong of the *Strickland* test, deficient performance, to find a Sixth Amendment violation. The second prong, prejudice, may be inherent in the specific type of attorney conduct underlying the claim. "Such circumstances exist 'if the accused is denied counsel at a critical stage of his trial.'" *Martin v. McCotter*, 796 F.2d 813, 820 (5th Cir.1986) (quoting *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039). Denial of counsel can be either actual denial or constructive denial. *See Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir.1997). A "constructive denial of counsel occurs when a criminal defendant must navigate a critical stage of the proceedings against him without the aid of 'an attorney dedicated to the protection of his client's rights under our adversarial system of justice.'" *Id.* (quoting *United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir.1991)). These types of "structural errors so undermine confidence in the fairness and reliability of the proceedings that prejudice is presumed." *Childress*, 103 F.3d at 1228 (citation omitted).

It is clear that the Supreme Court's decisions in *Cronic* and *Strickland* must be read holistically, that is, each opinion must be construed in light of the other. As noted by the Eleventh Circuit: "When *Cronic* and *Washington* are read in conjunction, it becomes evident that *Cronic's* presumption of prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffec-

tiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir.1984) *quoted in Martin*, 796 F.2d at 820. Justice Brennan clarified the scope of this "narrow spectrum of cases" in *Strickland* itself:

> Indeed, counsel's incompetence can be so serious that it rises to the level of a constructive denial of counsel which can constitute constitutional error without any showing of prejudice. *See Cronic*, 466 U.S., at 659–660, 104 S.Ct., at 2047; *Javor v. United States*, 724 F.2d 831, 834 (C.A.9 1984) ("Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all").

*Strickland*, 466 U.S. at 703, 104 S.Ct. 2052 (Brennan, J., concurring in part and dissenting in part). Accordingly, in Justice Brennan's opinion, the *Javor* case, where defense counsel slept during trial, is the epitome of constructive denial of counsel where no showing of prejudice is required.[4] A discussion of *Javor* is therefore necessary.

In *Javor*, the defendant's attorney fell asleep during portions of Javor's trial. However, it was not clear from the record when Javor's attorney was alert and when he was asleep. *See Javor*, 724 F.2d at 833. The Ninth Circuit held that such a determination was not necessary. Instead, it was only necessary to determine if counsel had been asleep for a "substantial portion of [Javor's] trial." *Id.* Without defining the term, the Ninth Circuit found that Javor's attorney had slept for a "substantial portion" of the defendant's trial and that such conduct constituted per se ineffective assistance of counsel in violation of the Sixth Amendment. *Id.*[5]

---

4. *Javor* is cited with approval in a plethora of subsequent cases where the courts have considered the issue of per se ineffective assistance of counsel. *See e.g. United States v. DiTommaso*, 817 F.2d 201, 215–15 (2d Cir. 1987); *Tippins v. Walker*, 77 F.3d 682, 685 (2d Cir.1996); *Siverson v. O'Leary*, 764 F.2d 1208, 1216–17 (7th Cir.1985); *Hollenback v. United States*, 987 F.2d 1272, 1275 (7th Cir. 1993); *United States v. Petersen*, 777 F.2d 482,

484 (9th Cir.1985); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir.1987); *Frazer v. United States*, 18 F.3d 778, 782 (9th Cir.1994); *United States v. Thompson*, 27 F.3d 671, 676 (D.C.Cir.1994). *But see Scarpa v. DuBois*, 38 F.3d 1, 12 (1st Cir.1994).

5. The dissent disagreed with the majority's opinion, arguing that defense counsel's conduct was not significant enough to constitute

The Ninth Circuit's opinion is based on the notion of constructive absence of counsel: "Prejudice is inherent in this case because unconscious or sleeping counsel is equivalent to no counsel at all." *Id.* at 834. Indeed, the "mere physical presence of an attorney does not fulfill the sixth amendment entitlement to the assistance of counsel[.]" *Id.* (citing *Holloway v. Arkansas,* 435 U.S. 475, 489, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). When an attorney is dozing or asleep, a "client cannot consult with his or her attorney or receive informed guidance from him or her during the course of the trial." *Javor,* 724 F.2d at 834 (citing *Geders v. United States,* 425 U.S. 80, 88–9, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (remaining citations omitted)). In other words, there must be the opportunity to conduct ongoing consultation between a defendant and his or her counsel throughout the course of a criminal trial. "Generally an attorney and client need to confer about the testimony or evidence adduced at trial and together evaluate its impact." *Javor,* 724 F.2d at 834 (citing *Geders,* 425 U.S. at 88, 96 S.Ct. 1330 (remaining citations omitted)). "Moreover, a trial attorney must be present and attentive in order to adequately test the credibility of witnesses on cross-examination, a matter of constitutional importance." *Javor,* 724 F.2d at 834 (citing U.S. Const. Amen. VI (confrontation clause); and *Chambers v. Mississippi,* 410 U.S. 284, 294–5, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (remaining citations omitted)). The Ninth Circuit in *Javor* concluded: "When a defendant's attorney is asleep during a substantial portion of his trial, the defendant has not received the legal assistance necessary to defend his interest at trial." *Javor,* 724 F.2d at 834.

The Ninth Circuit in *Javor* approved of a per se rule, thereby disposing of the prejudice prong of *Strickland,* because "an inquiry into the question of prejudice would require 'unguided speculation' and 'would not be susceptible to intelligent,

even handed application' because an attorney's absence prejudices a defendant more by what was not done than by what was done." *Id.* at 834–5 (citing *Cooper v. Fitzharris,* 586 F.2d 1325, 1332 (9th Cir.1978) (quoting *Holloway v. Arkansas,* 435 U.S. 475, 490, 491, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978))). Prejudice is presumed, therefore, "not because of specific errors or omissions indicating incompetence, but because [Javor] had no legal assistance during a substantial portion of his trial," *i.e.* when his attorney was asleep. *Id.* at 833. Counsel's performance while awake is irrelevant. *Id.* at 834. It is the fact that "a defendant is tried in the partial absence of counsel" that led the Ninth Circuit to hold that when a defense attorney sleeps through a substantial part of a criminal trial, the defendant "is prejudiced as a matter of law." *Id.* (citing *Holloway v. Arkansas,* 435 U.S. 475, 489–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)).

In *Tippins v. Walker,* 77 F.3d 682 (2d Cir.1996), the Second Circuit took the sleeping counsel per se ineffective assistance of counsel analysis a step further than the Ninth Circuit had in *Javor.* In *Tippins,* the Second Circuit, in reviewing a state petitioner's writ of habeas corpus, found ineffective assistance because of sleeping defense counsel. The Second Circuit adopted the Ninth Circuit's per se rule and the reasoning of the *Javor* court, but clearly was concerned about the scope of the per se rule. The critical issue to the Second Circuit was what constituted a "substantial portion of trial." *Id.* at 685. "The word 'substantial,' however, is unhelpful. It can refer to the length of time counsel slept, or the proportion of the proceedings missed, or the significance of those proceedings. The *Javor* court did not expound on the meaning of the word." *Id.* The court resolved this question by implementing a three step analysis in sleeping counsel cases: (1) did counsel sleep for repeated and/or prolonged lapses;

a per se rule. Specifically, the dissent noted that Javor's attorney only fell in and out of sleep briefly, and only at times when Javor's

interests were not at stake (there were multiple defendants in *Javor*). As discussed *infra,* these concerns do not affect the instant case.

(2) was counsel actually unconscious; and (3) were the defendant's interests at stake while counsel was asleep? *Id.* at 687. In so holding, the Second Circuit resolved any ambiguity that had existed in the Ninth Circuit's per se rule.

This Court finds the Second Circuit's analysis in *Tippins* to be compelling. The court reduced the Ninth Circuit's imprecise phrase "substantial portions" to a specific and well-articulated three-prong formula that allows the court to consider the totality of the circumstances in a given case. Indeed, as noted by the Supreme Court in *Strickland:*

> A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Strickland,* 466 U.S. at 696, 104 S.Ct. 2052, *cited in Tippins,* 77 F.3d at 687. Thus, the reviewing court must always keep the *Strickland* principle of "fundamental fairness" at the forefront of its considerations. The Second Circuit's formula allows for such an inquiry in a precise, logical, and cogent fashion.

Accordingly, this Court adopts the per se rule expounded in *Javor,* as modified by *Tippins,* regarding sleeping counsel and ineffective assistance of counsel. To be successful on such a per se ineffective assistance of counsel claim, the defendant must show that counsel slept for a substantial portion of the trial. The Court shall determine what constitutes a sub-

stantial portion of trial. In its determination, the Court shall address the frequency or length of the attorney's lapses, the state of consciousness of the attorney during these lapses, and whether the defendant's interests were at stake during these lapses. The overarching theme throughout the Court's inquiry must be the *Strickland* principle of fundamental fairness in the trial proceeding, for "a defense lawyer who fails to actively assist the defendant during a critical stage of the prosecution is not the counsel whose assistance is contemplated by the Sixth Amendment." *Childress,* 103 F.3d at 1232. Indeed, if the defendant is able to satisfy the aforementioned test, the violation would constitute a " 'constitutional error of the first magnitude' obviating the need for a showing of prejudice." *Id.* (quoting *Cronic,* 466 U.S. at 659, 104 S.Ct. 2039 (internal citation and quotation marks omitted)). Such a per se rule is compelled by the Supreme Court's clearly established Sixth Amendment jurisprudence. This Court now must apply the rule in the instant case.

■ The first element to be determined by this Court is did Cannon sleep for repeated or prolonged lapses? The record below and subsequently presented to this Court is clear. Jury foreperson Daniel Strickland testified at the evidentiary hearing that he had personally observed Cannon's dozing on two to five occasions. Juror Myra Davis recounted that she observed Cannon sleeping on more than one day of the trial, with the most number of episodes occurring on the second day of trial. Juror Craig Engelhardt testified that Cannon slept throughout portions of the guilt/innocence and the punishment phases of trial. Indeed, Engelhardt recalled one instance of Cannon's sleeping with specificity, as discussed further *supra.* Further, Clerk of Court Rose Marie Berry confirmed all three accounts. Berry also testified that Cannon had slept multiple times throughout Burdine's trial, including one instance that lasted at least ten minutes. Moreover, Berry noted that

Cannon's sleeping was not unprecedented conduct. Cannon had slept on other occasions in front of Berry, including pre-trial proceedings in the Burdine case. This testimony was reinforced by attorney Philip Scardino's rebuttal testimony regarding Cannon sleeping in a prior capital murder case. The state district court concluded that Cannon slept for numerous periods of time and the sleeping was "substantial." These findings of fact were explicitly adopted by the Texas Court of Criminal Appeals. This Court finds, pursuant to the presumption of correctness standard, that Cannon slept on numerous occasions throughout Burdine's criminal trial and for substantial periods of time.

This Court views the first prong of the *Tippins* substantial portion analysis to be disjunctive. That is, to satisfy the prong, the defendant need only show that counsel slept on multiple occasions or for prolonged periods of time. It is difficult to determine which hypothetical situation is more detrimental: whether counsel sleeps intermittently for thirty minutes out of an hour or whether counsel sleeps continuously for half an hour without waking. The total time asleep in both examples would be the same, *i.e.* thirty minutes. And indeed, the harm suffered by a defendant would be identical. In the instant case, Burdine has satisfied his burden with respect to either situation. The evidence is clear that Cannon slept on *at least* two to five occasions during the prosecution's case, at least one episode which lasted a minimum of ten minutes in length. This Court stresses that the "on two to five occasions" number is considering the evidence that the state district court found credible in the light most favorable to the state. Notwithstanding this conclusion, this Court emphasizes that Judge Burnett found Rose Marie Berry to be the most credible witness at the evidentiary hearing. Berry recalled "lots of incidents" when Cannon was asleep during Burdine's capital murder trial. Moreover, Burdine was the sole defendant. Every time Cannon was asleep the prosecution was introducing evidence directly against Burdine

or a prosecution witness was testifying directly against Burdine. In the circumstances of this case, Cannon's periods of sleep, which lasted at least ten minutes (on several different occasions, *see supra*) qualifies as a "prolonged lapse."

The second element to be determined by this Court is was Cannon unconscious? As noted by the Second Circuit, "the appearance of 'sleeping' may cover a range of behavior." *Tippins*, 77 F.3d at 688. Many attorneys feign boredom or drowsiness to detract from an adversary's presentation of the case. Such an allegation is simply another issue to be resolved by the available record and appropriate evidentiary hearings. In the instant case, Cannon claims that he may have closed his eyes and leaned back in his chair during periods of deep concentration. However, such a claim is discredited by the evidence. Berry testified that Cannon had his head down on his chest, and that he would lean and/or rock forward, not backwards as claimed by Cannon. Moreover, all three jurors, Strickland, Davis and Engelhardt, recalled Cannon's head "bobbing" or "nodding" as he came in and out of periods of sleep. On the other hand, not one of the four witnesses Judge Burnett found to be reliable and credible testified to the circumstances as presented by Cannon. Thus, this Court agrees with the state trial court's contention that Cannon's version of the facts is unsupported by the testimony presented at the evidentiary hearing.

It is true that there is no bright line that distinguishes consciousness from sleep. Certain stages of drowsiness overcome many individuals, and may or may not affect their capabilities at the given moment, depending on the depth of the lethargy. However, the record and evidence here is clear: Cannon was actually unconscious. The testimony of several witnesses at the evidentiary hearing is unequivocal. Berry, who the state district court found to be the most credible witness with no motive to misrepresent the facts, testified that Cannon was asleep for

at least ten minutes on one occasion. Cannon's head was down on his chest and "going backwards and forwards the way people do when they fall asleep." Berry, while seated at the Clerk of Court table, was only ten to twelve feet from where Cannon was seated, and Berry "sat there and watched him for a while and that's when I knew that he was actually asleep." Similarly, Strickland recalled that Cannon would "nod off" or "doze." Davis testified that Cannon repeatedly "nodded" with his eyes closed and chin on his chest. The third juror, Engelhardt, testified that Cannon "nodded" with his eyes closed and head down, as well. On at least one occasion, according to Engelhardt, Cannon was asleep for more than ten minutes when he was abruptly awakened by the clerk dropping a book on the courtroom floor. Finally, attorney Scardino impeached any possibility that Cannon could have been concentrating by testifying to Cannon's sleeping in the exact same manner in a previous capital murder trial where Scardino had been his second chair.

The third and final element to be determined by this Court is were Burdine's interests at stake during Cannon's periods of sleep? All four witnesses that testified that Cannon had slept during Burdine's trial noted that it happened during the presentation of the prosecution's case. According to Strickland, Cannon slept while "[t]here was either questioning [of witnesses by the prosecutor] or perhaps something being presented as evidence [by the prosecutor.]" Davis confirmed Strickland's account, testifying that "[a]s soon as the prosecutor would get on maybe a long spiel of talk for a while, it [the sleeping] would start." Both Engelhardt and Berry noted that Cannon's sleeping also occurred when the prosecution was either presenting evidence or eliciting testimony from a state witness.

Moreover, as Burdine was the sole defendant on trial, and Cannon was the sole defense attorney, Cannon's periods of sleep could only occur during the presentation of the prosecution's case directly against Burdine, *i.e.* crucial times when

Burdine's interests, including his life, were at stake. Hence, every prosecution witness should have compelled Cannon's fastidious and exacting attention. Contrary to the state's present assertions to this Court, there is absolutely no basis for the contention that Cannon was functioning as an attorney during these critical periods of Burdine's capital murder trial. There was clearly a breakdown in the adversarial process. *See Cronic,* 466 U.S. at 656–7, 104 S.Ct. 2039; *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. It is therefore apparent to this Court that Burdine was denied the effective assistance of counsel during his criminal trial in violation of his Sixth Amendment right to counsel.

This Court is reluctant to extend a per se rule of prejudice any further than is absolutely necessary to satisfy the constitutional requirements established in *Cronic* and its progeny. *See also Tippins,* 77 F.3d at 686 ("We are reluctant to extend a rule of per se prejudice in any new direction.") Ordinarily, the two-prong test enumerated in *Strickland v. Washington* will suffice to resolve instances of ineffective assistance of counsel. "Of course, the buried assumption in our *Strickland* cases is that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse. But that is an assumption we cannot make when counsel is unconscious at critical times." *Tippins,* 77 F.3d at 687. Indeed, "there is a great difference between having a bad lawyer and having no lawyer." *United States v. Taylor,* 933 F.2d 307, 312 (5th Cir.1991). This Court therefore concludes that when a defense attorney sleeps through a "substantial" portion (as previously defined *supra)* of his client's criminal trial, prejudice is to be presumed as a matter of law. A sleeping counsel is equivalent to no counsel at all. *Javor,* 724 F.2d at 834.

Because the Court determines that Burdine's conviction was unconstitutional due to his counsel sleeping throughout substantial portions of his criminal trial, it is not necessary for the Court to reach the

merits of Burdine's remaining points of error.

Based on the foregoing, the Court hereby

ORDERS that Burdine's petition for writ of habeas corpus is GRANTED and his state conviction below is VACATED. Accordingly, it is ORDERED that the State of Texas SHALL EITHER RETRY OR RELEASE Burdine within 120 days of the date of the entry of this order. It is further ORDERED that Johnson's motions for summary judgment are DENIED.